**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

———————————————————
                                                    )
CRAIG FISHER,                                       )
                                                    )
                          Petitioner,               )        No. 20-855
                                                    )
            v.                                       )        Filed: May 23, 2024
                                                    )
SECRETARY OF HEALTH AND                             )        Re-issued: June 13, 2024*
HUMAN SERVICES,                                     )
                                                    )
                          Respondent.               )
———————————————————                                 )

**<u>OPINION AND ORDER</u>**

Petitioner Craig Fisher ("Petitioner") seeks review of a decision denying compensation under the National Vaccine Injury Compensation Program ("Vaccine Act"), 42 U.S.C. § 30aa-10 *et seq.* Petitioner filed a petition for compensation alleging that he suffered from pure sensory brachial neuritis caused by the influenza vaccine. On December 4, 2023, the Chief Special Master denied Petitioner's claim, finding that Petitioner had not established by a preponderance of evidence that he suffered the claimed injury. Before the Court is Petitioner's Motion for Review of the Chief Special Master's entitlement decision pursuant to Rules 23 and 24 of the Vaccine Rules of the United States Court of Federal Claims ("Vaccine Rules"). For the reasons discussed below, the Court **DENIES** Petitioner's Motion.

---

\* The Court issued this opinion under seal on May 23, 2024, and directed the parties to file any proposed redactions by June 6, 2024. As the parties do not propose any redactions, the Court reissues the opinion publicly in full.

## I.  BACKGROUND

### A.    Petitioner's Medical History Prior to Vaccination

At the time of the alleged injury, Petitioner was 67 years old with no history of medical issues involving his back, shoulder, or elbow prior to vaccination.  Pet'r's Ex. 1, ¶¶ 1, 6, ECF No. 6-1.  On January 12, 2018, Petitioner was admitted to the hospital for epigastric pain.  *Id.* ¶¶ 2–3. Petitioner underwent emergency surgery for a hernia and was hospitalized for one-week post-surgery.  *Id.*  Records from this time indicate that Petitioner had numerous comorbidities, including diabetes, atrial fibrillation, coronary artery disease, chronic renal disease, hypertension, and sleep apnea.  Pet'r's Ex. 3 at 5, ECF No. 6-3.  Records from physical examinations on January 13, 2018, while Petitioner was hospitalized, indicate that his extremities were "normal," and his neurological system showed "normal motor and sensory" functions.  *Id.* at 12.  Petitioner was discharged from the hospital on January 19, 2018.  ECF No. 6-1, ¶ 3.  Just prior to leaving the hospital, upon recommendation of the charge nurse, Petitioner received the flu vaccine in his left deltoid.  *Id.* Petitioner had received flu shots in the past without any complications.  Pet'r's Ex. 4 at 141, ECF No. 6-4.

### B.    Petitioner's Onset of Symptoms and Treatment

On January 21, 2018, two days after vaccination, Petitioner alleges that he awoke with a severe pain in his left upper arm.  ECF No. 6-1, ¶ 4.  Records from a home health care nurse's visit do not indicate that he experienced any left shoulder or arm pain, though the notes mention anxiety and fatigue.  Pet'r's Ex. 7 at 6, 9, 10, ECF No. 6-7.  On January 23, 2018, Petitioner visited his primary care physician, Dr. Patrick Murphy, and complained of "severe arm pain from [the] [f]lu vaccine [four] days ago."  Pet'r's Ex. 9 at 235, ECF No. 22-1.  Dr. Murphy diagnosed Petitioner with left upper extremity pain and prescribed pain relief medication.  *Id.* at 234, 241.  On January

24 and 31, 2018, Petitioner received additional in-home health care visits related to his surgery. ECF No. 6-7 at 40, 59.  At both visits, Petitioner described his left arm pain as an "ache" that was exacerbated by physical activity.  *Id.* at 41, 60.  On February 7, 2018, Petitioner informed the home health care nurse that his doctor approved his return to work, that he was "no longer home bound," and that he did not have a "skilled need" for in-home care.  *Id.* at 73.

On March 30, 2018, Petitioner saw Dr. Murphy for routine management of his diabetes, hypertension, and hyperlipidemia conditions.  ECF No. 22-1 at 246–47.  At this visit, Petitioner exhibited left hand numbness, and Dr. Murphy diagnosed him with diabetes mellitus with circulatory complication and chronic diabetic polyneuropathy.  *Id.* at 252, 245–46.  On July 3, 2018, Petitioner again saw Dr. Murphy for management of his chronic conditions.  ECF No. 6-4 at 5.  At this visit, Dr. Murphy recorded Petitioner's physical exam as normal, and included diabetic polyneuropathy in his assessment of Petitioner's conditions.  *Id.* at 11, 6.  On August 23, 2018, Petitioner returned to see Dr. Murphy for urinary frequency and left arm pain.  *Id.* at 20.  Petitioner reported that the onset of arm pain occurred in January 2018 due to an "injection reaction."  *Id.* Petitioner described the pain as located in his "left upper arm to fingers," that it was a "moderate" and "aching" pain, and that he felt numbness in his second and third fingers.  *Id.*  Among other conditions, Dr. Murphy's assessment of Petitioner again included diabetic polyneuropathy.  *Id.* On October 4, 2018, Petitioner saw Dr. Murphy for a diabetes follow up appointment.  *Id.* at 32. The record from this visit lists the flu vaccine as an allergen for Petitioner.  *Id.* at 35.

Almost one year later, on September 24, 2019, Petitioner saw Dr. Brooke McQueen, a neurologist.  *Id.* at 141.  Dr. McQueen recorded the history of Petitioner's left arm pain and noted that he "presented to the clinic with complaints of numbness, tingling, burning, and pins and needle sensation" in his left arm that started "after the flu shot."  *Id.*  At this visit, Petitioner reported to

Dr. McQueen that Dr. Murphy "thought the injection hit a nerve in the arm when he got the flu shot and that this would improve [with] time." *Id.*  Dr. McQueen diagnosed Petitioner with neuropathy and suspected that Petitioner might have carpal tunnel syndrome ("CTS"). *Id.* at 160. Dr. McQueen ordered an electromyography test ("EMG") test. *Id.*  The EMG results showed that Petitioner had CTS and chronic cervical radiculopathy, with the left side worse than the right for both conditions.[1]  Pet'r's Ex. 8 at 13–14, ECF No. 13-1.

On March 24, 2020, Petitioner had a telemedicine appointment with Dr. McQueen.  ECF No. 6-4 at 163.  Petitioner complained of numbness and "tingling, burning/sharp/electrical pain" in some of his left fingers.  *Id.* at 164.  Dr. McQueen noted that Petitioner had "no reported weakness in the left arm . . . [or] left hand." *Id.* at 164–65.  Considering these symptoms and the results of Petitioner's EMG test, Dr. McQueen diagnosed Petitioner with: "1. Neuropathy; 2. Cervical radiculopathy; 3. Bilateral carpal tunnel syndrome; 4. Neuropathic pain of hand, left." *Id.* at 163; *see id.* at 175.  In addition, Dr. McQueen reported that Petitioner had "mild pinched nerves in the neck" but that there was "nothing to do at this time, likely age related." *Id.* at 176.  Dr. McQueen advised Petitioner that "likely he will have some permanent residual deficits from his nerve injury" and that he should wear wrist splints at night for his CTS.  *Id.*

In a sworn statement dated July 1, 2020, Petitioner describes his pain as persistent and that the Naproxen and hydrocodone prescribed by Dr. Murphy did not provide relief.  ECF No. 6-1, ¶ 5.  Petitioner reports that he must either ice the area of pain, take a hot shower, or seek massage therapy to find some "temporary relief." *Id.* ¶ 6.

---

[1] Petitioner's EMG test, performed on September 27, 2019, included nerve conduction studies.  Pet'r's Ex. 8 at 13–14, ECF No. 13-1.  These studies are referred to separately by the parties in their briefing materials and by the experts in their reports as "NCS" tests.  The Court's references to Petitioner's "EMG test" are inclusive of the NCS tests performed as part of the September 27, 2019, EMG test.

**C.    Procedural History**

On July 14, 2020, Petitioner filed a petition with the Office of Special Masters requesting compensation under the Vaccine Act.  *See* ECF No. 1.  Petitioner alleges that after he received the influenza vaccine, he developed chronic pain and neuropathy.  *Id.* ¶¶ 14–15.  Petitioner's case was initially assigned to the Special Processing Unit ("SPU") based on the Office of Special Masters' anticipation that the claim was likely to settle.  *See* Notice, ECF No. 4; SPU Initial Order, ECF No. 10.  On December 10, 2020, Petitioner filed a Statement of Completion notifying the court that he had filed all outstanding relevant medical records.  *See* ECF No. 14.  On June 16, 2021, Respondent filed its Rule 4(c) Report, disputing Petitioner's claims and requesting the court dismiss the matter.  *See* ECF No. 21.

On August 17, 2021, the matter was removed from the SPU due to issues raised in Respondent's Rule 4 report and was reassigned to the Chief Special Master's regular docket.  *See* Order, ECF No. 24.  Petitioner proceeded to file his expert reports (ECF Nos. 26, 41, 67) and supporting medical literature (ECF Nos. 27–29, 38).  Respondent filed its expert reports (ECF Nos. 31, 44, 66) and supporting medical literature (ECF Nos. 37, 49) as well.  A two-day Entitlement Hearing was held on April 13–14, 2023.  *See* Minute Entry (Apr. 14, 2024).  The Chief Special Master issued an Entitlement Decision on December 4, 2023, denying the Petition because Petitioner did not establish his claimed injury by a preponderance of evidence.  Entitlement Dec. at 1, ECF No. 69.  On January 2, 2024, Petitioner filed the present Motion for Review, and on January 24, 2024, Respondent filed its Response.  *See* ECF Nos. 70, 73.  On January 31, 2024, Petitioner filed a Motion for Leave to File Petitioner's Reply in Support of Motion for Review.  *See* ECF No. 74.

### D. Expert Opinions

In reaching his decision, the Chief Special Master reviewed Petitioner's medical records and eight expert reports filed by three different experts: three reports filed by Petitioner's expert and five reports filed by Respondent's two experts. *See generally* Pet'r's Ex. 10, ECF No. 26-1; Pet'r's Ex. 42, ECF No. 41-1; Pet'r's Ex. 53, ECF No. 67-1; Resp't's Ex. A, ECF No. 31-1; Resp't's Ex. C, ECF No. 31-3; Resp't's Ex. E, ECF No. 44-1; Resp't's Ex. F, ECF No. 44-2; Resp't's Ex. G, ECF No. 66-1.

#### 1. Petitioner's Expert Reports

Petitioner retained one expert, Dr. Peter-Brian Andersson, a clinical neurologist who has treated over one hundred cases of brachial neuritis.[2]  ECF No. 69 at 5–6; ECF No. 26-1 at 1–2.

In his first report, Dr. Andersson reviewed Petitioner's medical history and summarized Petitioner's EMG test from September 27, 2019.  ECF No. 26-1 at 2–6.  Dr. Andersson noted the "paucity of abnormalities, including for carpal tunnel syndrome and cervical radiculopathy" in Petitioner's records and concluded that the EMG test showed that "these conditions [we]re not explanatory" of Petitioner's symptoms.  *Id.* at 6.  Specifically, Dr. Andersson asserted that the numbness in Petitioner's fingers was not consistent with CTS or cervical radiculopathy, rebutting the treating physicians' diagnoses.  *Id.* at 8–9.  Instead, Dr. Andersson diagnosed Petitioner with neuralgic amyotrophy (an "equivalent" term to brachial plexitis and brachial plexitis neuropathy) "to a reasonable medical probability."  *Id.* at 7.  According to Dr. Andersson, only this diagnosis can account for the entirety of Petitioner's symptoms, all of which he characterized as "striking." *Id.* at 7–8.  The factors he considered relevant to the diagnosis included: severity of the pain, apparent lack of a cause of the pain, distribution (wide) of the pain, time course (sudden severe

---

[2] Dr. Andersson's CV is found at Pet'r's Ex. 11, ECF No. 26-2.

onset), persistence of the pain, and associated neurogenic features (severity, constancy, absence of musculoskeletal association). *See id.*

In addition, Dr. Andersson described how Petitioner's case meets the legal standard for causation in a Vaccine Act case. Dr. Andersson opined that the process of "molecular mimicry"[3] can cause brachial neuritis by activating an immune response and potentially causing a vaccination-induced neuropathic injury. *Id.* at 10–13. Dr. Andersson further opined that he "d[id] not find any other explanations for why Petitioner contracted neuralgic amyotrophy [other] than vaccination" and that the "timing correlates" between vaccination to onset of Petitioner's symptoms. *Id.* at 14.

Dr. Andersson filed two supplemental reports, one in rebuttal to Respondent's experts' reports and another that elaborates on whether brachial neuritis can be caused by an innate immune response. *See* ECF Nos. 41-1, 67-1. In his rebuttal, Dr. Andersson specifically objected to Respondent's expert's opinion on Petitioner's EMG test results, stating that the expert "fail[ed] to reject a diagnosis of brachial plexitis" and that the "[EMG] study was hamstrung by its limitations." ECF No. 41-1 at 3. Dr. Andersson also rebutted Respondent's expert's opinion disputing that the flu vaccine can cause Petitioner's claimed injury, asserting that the expert ignored the record and held Petitioner's expert (Dr. Andersson) to a higher bar than himself. *Id.* at 10. In his report discussing innate immune responses to a vaccine, Dr. Andersson first noted that although the timeframe from vaccination to onset of symptoms in Petitioner was rapid, "a memory adaptive response" can explain Petitioner's sudden symptoms. ECF No. 67-1 at 1. Even

---

[3] Dr. Andersson described "molecular mimicry" as a process that happens when "'cross reacting' homologies that are shared between a foreign antigen and brachial plexus tissues result in an antibody mediated and or cytotoxic T cell mediated 'friendly fire' attack on the host." ECF No. 67-1 at 1.

so, Dr. Andersson also explained that "any factor" including vaccination can "provok[e] the innate immune system [and] can serve as the immunological trigger" for the injury.[4]  *Id.* at 2. Furthermore, Dr. Andersson asserted that there is "no mechanism" by which Petitioner's surgery just days prior to receiving the vaccine could be the cause of his injury.  *Id.* at 3.

      2.   <u>Respondent's Expert Reports</u>

Respondent retained two experts: Dr. Brian C. Callaghan, a neuromuscular specialist with expertise in the treatment of neuropathies like brachial neuritis, and Dr. Andrew MacGinnitie, an immunologist who is the Clinical Director for the Division of Immunology at Boston Children's Hospital and an Associate Professor of Pediatrics at Harvard Medical School.[5]  ECF No. 69 at 8, 11.

Dr. Callaghan characterized brachial neuritis as "rare" and estimated he has seen over 50 patients with the condition.  ECF No. 31-1 at 1.  In his first report, Dr. Callaghan agreed with Petitioner's treating physicians' diagnoses of neuropathy, cervical radiculopathy, and CTS.  *Id.* at 4.  Dr. Callaghan disagreed with Petitioner's brachial neuritis claim because Petitioner did not exhibit all the symptoms for the condition according to the Act's Vaccine Injury Table ("Table"). *Id.* at 4–5.  He noted that Petitioner's EMG test "revealed injury to the median nerve (carpal tunnel syndrome) and the cervical nerve roots (C5 and C7 radiculopathies) and not the brachial plexus." *Id.* at 5.  As to causation, Dr. Callaghan asserted that available medical data points to infections (rather than vaccines or surgery) as being "by far the most common antecedent event prior to

---

[4] Dr. Andersson explained that activation of complement (a component of the innate immune system that defends against foreign pathogens) in brachial neuritis "provides further evidence that an acute onset of symptoms within just a couple of days following a trigger is due to an innate immune-mediated response."  ECF No. 67-1 at 2.

[5] Dr. Callaghan's CV is found at Resp't's Ex. B, ECF No. 31-2.  Dr. MacGinnitie's CV is found at Resp't's Ex. D, ECF No. 31-4.

brachial neuritis." *Id.*  Dr. Callaghan also disagreed with Dr. Andersson's molecular mimicry theory—linking vaccines to the onset of brachial neuritis, based on similarities between brachial neuritis and Guillain-Barre Syndrome ("GBS")—because there is no reliable evidence to support this claim and because brachial neuritis and GBS are distinct neurologic diseases.  *Id.* at 6.  Dr. Callaghan concluded that there is "insufficient evidence to support a causal relationship between" the flu vaccine and brachial neuritis.  *Id.* at 7.

In rebuttal to Dr. Andersson's report, Dr. Callaghan reiterated his original assessment of Petitioner's diagnosis and his disagreement with Dr. Andersson's causation analogy to GBS, and he provided further explanation of EMG test results generally.  *See* ECF No. 44-1.  According to Dr. Callaghan, findings of cervical radiculopathy and CTS on an EMG test are indicative of a "severe" occurrence of those conditions "affecting the motor nerves in addition to the sensory nerves" (rebutting Dr. Andersson's contention that Petitioner's EMG results for these conditions were "minimal").  *Id.* at 2.  Dr. Callaghan also disputed Dr. Andersson's conclusion that Petitioner suffered from pure sensory brachial neuritis because such a diagnosis would be a "rare presentation of an already uncommon disease," and supporting evidence is lacking in Dr. Andersson's report. *Id.* at 1.

Dr. MacGinnitie's first report focused on the causation theory offered by Dr. Andersson rather than Petitioner's alleged injury.  ECF No. 31-3 at 5.  Dr. MacGinnitie asserted that Dr. Andersson did not provide specifics on how "molecular mimicry" (*i.e.*, "cross-reactivity between vaccine and human antigens") could cause an immune response leading to Petitioner's symptoms. *Id.* at 6.  In addition, Dr. MacGinnitie rebutted Dr. Andersson's analogy to vaccine causation in cases of GBS because Dr. Andersson provided "no evidence that similar cross-reactivity exist[s] between influenza vaccine components and human nervous tissue."  *Id.*  Dr. MacGinnitie also

explained why the timeframe between Petitioner's receipt of the vaccine and onset of symptoms did not support a causal link to the vaccine. *Id.* at 7–8. Rather, he pointed to Petitioner's abdominal surgery, a few days prior to receiving the vaccine, as the likely cause of his later symptoms. *Id.* at 8.

In rebuttal to Dr. Andersson's report, Dr. MacGinnitie reiterated his conclusions from his first report. *See* ECF No. 44-2. Dr. MacGinnitie provided diagnostic criteria for establishing a causative relationship between a vaccine and an injury via molecular mimicry and concluded that Dr. Andersson did not provide supporting evidence meeting these criteria. *Id.* at 1–2. Furthermore, Dr. MacGinnitie noted that the timing of the onset of Petitioner's symptoms is "incompatible with an adaptive immune response" and again pointed to his surgery a few days prior as a more likely potential cause of Petitioner's injury. *Id.* at 2.

Dr. MacGinnitie also filed a supplemental report elaborating on whether an innate immune response can cause brachial neuritis. *See* ECF No. 66-1. Here, Dr. MacGinnitie provided an explanation of the innate and adaptive arms of the immune system and how these responses work together to cause brachial neuritis. *Id.* at 2–9. Dr. MacGinnitie noted that infections and vaccinations activate both the innate and adaptive immune response; however, he opined that "few physicians would consider onset of symptoms [less than] 48 hours after vaccination as consistent with a sound theory of a vaccine being causative." *Id.* at 8. Accordingly, Dr. MacGinnitie asserted that an innate immune response is not a plausible cause of brachial neuritis, and an influenza vaccination is not a strong stimulus for the innate immune response. *Id.* at 10.

### E.    The Entitlement Decision

On December 4, 2023, the Chief Special Master issued his Entitlement Decision, in which he denied Petitioner's claim. ECF No. 69 at 1. Specifically, the Chief Special Master held that

Petitioner had not met his burden to show his alleged injury by preponderant evidence. *Id.* at 25. Because Petitioner did not sufficiently prove his alleged injury, the Chief Special Master did not perform the three-prong causation analysis set forth in *Althen v. Secretary of Health and Human Services*, 418 F.3d 1274 (Fed. Cir. 2005). *Id.* at 23 n.13.

In reaching his decision, the Chief Special Master reviewed the testimony, reports, and supporting literature offered by both Petitioner's and Respondent's fact and expert witnesses. With respect to Petitioner's expert witness, the Chief Special Master noted Dr. Andersson's explanation of brachial neuritis and its associated symptoms. *Id.* at 6. He also summarized Dr. Andersson's opinions as to Petitioner's purported immune response to the vaccine that resulted in his alleged injury and the timeframe within which Petitioner's symptoms arose as being "consistent with an adaptive/secondary immune-mediated process." *Id.* at 6–8.

The Chief Special Master also provided an overview of Respondent's first expert witness's testimony regarding the diagnostic criteria for brachial neuritis. *Id.* at 9. The Chief Special Master noted Dr. Callaghan's conclusion that Petitioner's symptoms did not meet these criteria and that Petitioner's past medical history was more likely an explanation for Petitioner's symptoms. *Id.* at 9–10. The Chief Special Master likewise reviewed Respondent's second expert witness's testimony about whether there is a causal connection between the flu vaccine and the type of problems suffered by Petitioner. *Id.* at 10. The Chief Special Master then observed that while Dr. MacGinnitie agreed with Dr. Andersson's explanation of an adaptive immune response to a vaccine and the relation of "molecular mimicry" to this response, Dr. MacGinnitie ultimately did not agree that molecular mimicry explained how the flu vaccine could cause brachial neuritis. *Id.* at 11–12.

Finally, the Chief Special Master summarized the parties' supplemental reports submitted after the Entitlement Hearing "addressing whether brachial neuritis can be caused by an innate immune response." *Id.* at 13. The Chief Special Master noted Dr. Andersson's opinion that brachial neuritis could result from an innate immune response "through an 'acute, nonspecific, immune-mediated inflammatory response triggered by localized inflammation, complement cascade and localized lymphocytic infiltration[,]'" which were "all present in Petitioner's case." *Id.* at 14. The Chief Special Master observed that, conversely, Dr. MacGinnitie denied that an innate immune response alone could cause brachial neuritis. *Id.* at 15. Rather, Dr. MacGinnitie had asserted that "the majority of influenza vaccines administered in the U.S. are unadjuvanted, including the one [Petitioner] received, where adjuvants are materials added to vaccines specifically to trigger the innate immune system." *Id.*

After reviewing the medical evidence and expert opinions, the Chief Special Master provided an overview of how the Office of Special Masters treats brachial neuritis claims. *Id.* at 22. The Chief Special Master acknowledged that even though the Table only provides for a claim of brachial neuritis after receipt of the tetanus vaccine, some special masters have found that other vaccines, including the flu vaccine, may also cause the condition. *Id.* The Chief Special Master tempered this potential finding of a causal link with the weight he generally affords to evidence of the onset of symptoms within a medically acceptable timeframe. *Id.* With this context, the Chief Special Master then proceeded to explain why Petitioner's claimed injury was not sufficiently supported by the evidence and why disposition of the case depended upon such finding. *Id.* at 22–24.

First, the Chief Special Master found that Petitioner's alleged injury was "not corroborated by record evidence of contemporaneous treater support." *Id.* at 23. Rather, he found that the

records from Petitioner's visits to his neurologist, Dr. McQueen, were more supportive of the diagnoses embraced by Respondent's expert witness—*i.e.*, CTS, chronic cervical radiculopathy, and neuropathy.  *Id.* at 23, 24.

Second, the Chief Special Master agreed with Respondent's expert's analysis regarding the criteria for a brachial neuritis claim, which he found to be lacking in Petitioner's case.  *Id.* at 23–24.  Specifically, he found Dr. Callaghan had demonstrated that Petitioner's symptoms meet only one ("pain in the affected arm and shoulder") of the four criteria that would establish a Table Claim for brachial neuritis.[6]  *Id.*  The Chief Special Master reiterated Dr. Callaghan's findings that Petitioner did not show symptoms of "weakness," nor did his "motor, sensory, reflexes findings, and EMG/NCS studies confirm[] dysfunction in the brachial plexus," and there were other "condition[s] or abnormalit[ies]" present, specifically the EMG test was supportive of CTS and radiculopathy diagnoses.  *Id.* at 23–24.

Finally, the Chief Special Master found that Petitioner had failed to provide preponderant evidence establishing that his injury was the "especially uncommon, pure sensory form of brachial neuritis."  *Id.* at 24.  Consistent with Dr. Callaghan's report, the Chief Special Master found that "no treater so diagnosed Petitioner."  *Id.*  Furthermore, the EMG testing Petitioner underwent "did not reveal injury to sensory nerves (as would be expected in a pure sensory form of brachial neuritis)," but instead was "consistent" with the same findings made by Petitioner's treating physicians—namely, CTS, cervical radiculopathy, and neuropathy.  *Id.*  Accordingly, the Chief Special Master denied Petitioner's claim for entitlement to compensation because his alleged injury lacked preponderant evidentiary support.  *Id.* at 25.

---

[6] The Chief Special Master acknowledged that the Table criteria for a brachial neuritis claim are "not controlling" in this off-Table matter, nonetheless they "provide useful guidance for brachial neuritis's elements."  ECF No. 69 at 23.

### F.    The Motion for Review

On January 2, 2024, Petitioner timely filed a Motion for Review of the Entitlement Decision.  *See* ECF No. 70.  Petitioner asks the Court to remand his claim to the Chief Special Master with instructions to find that Petitioner met his burden to preponderantly prove the alleged injury and to "conduct further proceedings consistent with this determination."  Pet'r's Mem. of Objs. in Supp. of Mot. for Rev. at 24, ECF No. 71.  Specifically, Petitioner claims that the Chief Special Master arbitrarily and capriciously elevated his burden to demonstrate a rare injury.  *Id.* at 15.  He also claims the Chief Special Master arbitrarily and capriciously elevated his burden to show that the treating physicians made the exact same diagnosis as Petitioner's expert witness and that the treating physicians correctly diagnosed Petitioner with a rare illness.[7]  *Id.* at 19. Petitioner's Motion for Leave to File a Reply and the proposed Reply In Support of Motion for Review reiterate arguments found in his Motion for Review.  *See* ECF Nos. 74, 74-1.

On January 24, 2024, Respondent filed its response to Petitioner's Motion for Review, arguing that the Chief Special Master's determination was not arbitrary or capricious because he appropriately considered all relevant evidence, including opinions of the parties' experts, and discussed why the evidence supported his findings.  Resp't's Resp. to Pet'r's Mot. for Rev. at 14–16, ECF No. 73.  In addition, Respondent argues that the Chief Special Master appropriately considered the contemporaneous medical records when determining that Petitioner had not established a diagnosis of brachial neuritis, the claimed injury.  *Id.* at 17.  Because Petitioner had

---

[7] Although Petitioner frames his questions presented as involving the arbitrary and capricious standard, the Motion argues that the Chief Special Master committed errors of law, which would be reviewed under the "not in accordance with law" standard.  *See Vinesar v. Sec'y of Health & Hum. Servs.*, 170 Fed. Cl. 681, 691 (2024).  Since a misapplication of the burden of proof would be considered a legal error, the remainder of the opinion refers to the arguments as such.  Ultimately, however, the substance of the arguments relates to the Chief Special Master's weighing of evidence, and thus the Court will also apply the arbitrary and capricious standard.

not met the initial burden of establishing the claimed injury, Respondent argues that the Chief Special Master was not required to perform an *Althen* analysis.  *Id.* at 18.

## II.  LEGAL STANDARD

### A.    The Court's Standard of Review

This Court has jurisdiction to review a special master's entitlement decision upon the timely request of either party.  42 U.S.C. § 300aa-12(e)(2).  Under the Vaccine Act, the Court when deciding a motion for review may:

(A)  uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B)  set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(C)  remand the petition to the special master for further action in accordance with the court's direction.

*Id.* §§ 300aa-12(e)(2)(A)–(C); *accord* Vaccine Rule 27(c).  The standards of review set forth in 42 U.S.C. § 300aa-12(e)(2)(B) "vary in application as well as degree of deference" as each "standard applies to a different aspect of the judgment."  *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).  The special master's factual findings are reviewed under an arbitrary and capricious standard.  *Id.*  This scope of review is thus limited and highly deferential.  *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000); *see Munn*, 970 F.2d at 870 (review of a special master's factual findings is "well understood to be the most deferential possible" (citations omitted)).  "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate."  *Hines ex rel. Sevier v. Sec'y of Dep't of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).  When the Court's review of a special master's decision involves statutory construction or other legal issues, it applies the "not

in accordance with law" standard. *Id.* at 1527. The third standard of review, abuse of discretion, is applicable when the special master excludes evidence or otherwise limits the record upon which he relies. *See Munn*, 970 F.2d at 870 n.10.

**B.     The Standard of Causation in Vaccine Cases**

The duty of a special master in a vaccine case is to determine, by a preponderance of evidence, whether the vaccine caused the alleged injury. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010) (citing *Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Hum. Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009)). A petitioner may establish that a vaccine caused an alleged injury in one of two ways. 42 U.S.C. § 300aa-11(c); *see Munn*, 970 F.2d at 865. First, a petitioner who has received a vaccine listed on the Table may recover for any resulting illness, disability, injury, or condition that is also listed on the Table, or a significant aggravation thereof. 42 U.S.C. §§ 300aa-11(c)(1)(C)(i), 300aa-14; *see Althen*, 418 F.3d at 1278 (describing a "Table injury"). Second, a petitioner who has received a vaccine listed on the Table, but whose vaccine-related injury does not meet Table requirements, may recover under an "off-Table" theory. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii), 300aa-13(a)(1)(A).

A petitioner's establishment of an actual injury is a prerequisite to the causation determination. *Broekelschen*, 618 F.3d at 1346 ("[E]ach prong of the *Althen* [causation] test is decided relative to the injury . . . ."); *see* 42 U.S.C. § 300aa–11(a) (creating a cause of action for persons suffering a "vaccine-related injury"). In limited cases where the parties allege competing diagnoses, a special master must "first determine which injury was best supported" by the evidence in the record before proceeding to the *Althen* causation analysis. *Broekelschen*, 618 F.3d at 1346. This includes cases where "the injury itself is in dispute, [or] the proposed injuries differ significantly in their pathology, and the question of causation turns on which injury [the petitioner]

16

suffered." *Id.* (quoting *Kelley v. Sec'y of Health & Hum. Servs.*, 68 Fed. Cl. 84, 100–01 (2005)); *see Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1352–53 (Fed. Cir. 2011) (an initial determination of the injury is necessary where there is "extreme disagreement among well-qualified medical experts"); *Contreras v. Sec'y of Health & Hum. Servs.*, 107 Fed. Cl. 280, 294–95 (2012). Importantly, if the special master determines that a petitioner did not establish his claimed injury by a preponderance of evidence, then the special master does not need to undertake the three-prong *Althen* causation analysis. *Lombardi*, 656 F.3d at 1353. In that scenario, the special master may deny the claim as an initial matter because the alleged injury is the "underpinning" of the petitioner's claim. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012).

Assuming he meets that initial burden, a petitioner may make a prima facie case of entitlement to compensation under an off-Table theory by showing, by a preponderance of evidence, that a Table vaccine actually caused the petitioner to sustain that claimed illness, disability, injury, or condition which is not listed on the Table, or that first appeared outside the time limits set by the Table. 42 U.S.C. § 300aa-11(c)(1)(C)(ii); *see Pafford v Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). For a petitioner to successfully recover for an off-Table claim, he or she must establish causation-in-fact. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii), 300aa-13(a)(1); *Pafford*, 451 F.3d at 1355. This requires "preponderant evidence both that [the] vaccination[] [was] a substantial factor in causing the illness, disability, injury or condition and that the harm would not have occurred in the absence of the vaccination." *Pafford*, 451 F.3d at 1355 (citing *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)). Although the vaccination "must be a 'substantial factor'" in bringing about the injury, "it

need not be the sole factor or even the predominant factor." *Id.* at 1357 (quoting *Shyface*, 165 F.3d at 1352–53).

To make the showing that "the vaccination brought about [the] injury," a petitioner must show: "(1) a medical theory causally linking the vaccine and the injury; (2) a logical sequence of cause and effect showing the vaccine was the reason for the injury; and (3) a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. "[N]either a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation" under the three-factor test. *Id.* (citing *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1149 (Fed. Cir. 1992)). Nor may the special master make a finding of causation based on the claims of a petitioner alone, which are not substantiated by medical records or by medical opinion. *See* 42 U.S.C. § 300aa-13(a)(1). Thus, the presentation of medical records or medical opinion supporting a claim is a prerequisite to recovery. *Id.*

In off-Table cases, petitioners bear the burden to prove actual causation by a preponderance of evidence. *Althen*, 418 F.3d at 1278; *see* 42 U.S.C. § 300aa-11(c)(1)(A). The preponderant-evidence standard requires that a petitioner demonstrate proof "by a simple preponderance, of 'more probable than not' causation." *Althen*, 418 F.3d at 1279 (citing *Hellebrand v. Sec'y of Health & Hum. Servs.*, 999 F.2d 1565, 1572–73 (Fed. Cir. 1993)). This standard "'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.'" *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension T. for S. Cal.*, 508 U.S. 602, 622 (1993)). In evaluating the evidence put forth to meet the preponderance standard, the special master has discretion to determine the relative weight of the evidence presented, including

contemporaneous medical records and oral testimony.  *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993); *see also Hibbard*, 698 F.3d at 1368.

If a petitioner presents adequate evidence on the three essential aspects of causation, and thus makes a prima facie case for liability, the burden shifts to Respondent to prove, by a preponderance of evidence, an alternate cause of the alleged injury.  *Althen*, 418 F.3d at 1278; *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

### III. DISCUSSION

Petitioner's Motion raises two objections to the Chief Special Master's decision.  First, Petitioner contends that the Chief Special Master improperly elevated Petitioner's burden of proof by requiring him to prove a rare injury with scientific certainty and by applying diagnostic criteria for a different injury.  ECF No. 71 at 6, 18–19.  Second, Petitioner contends that the Chief Special Master improperly elevated his burden of proof by requiring Petitioner's treating physicians and expert witness to have made the same diagnosis—which in essence required the treaters to have correctly diagnosed a rare illness—and by improperly making his entitlement determination prior to shifting the burden of proof to Respondent to rebut Petitioner's prima facie case.  *Id.* at 6–7, 22–24; ECF No. 74-1 at 2–3.

Having considered the arguments and the record, the Court rejects both claims.  The Chief Special Master did not commit an error of law, rather he followed clear Federal Circuit precedent in first determining the underlying injury, which was a matter in dispute and on which the *Althen* causation analysis was dependent.  *Broekelschen*, 618 F.3d at 1350; ECF No. 69 at 22–23.  In reaching his conclusion, the Chief Special Master properly weighed the evidence in the record, including the parties' expert reports, fact and expert witness testimony, submitted literature, and Petitioner's medical records, and made a rational determination of injury based on that evidence.

19

*Burns*, 3 F.3d at 417; ECF No. 69 at 23–25.  Accordingly, the Chief Special Master's decision is upheld.

A.   **The Chief Special Master Did Not Make an Error of Law by Elevating Petitioner's Burden of Proof.**

Petitioner alleges that the Chief Special Master made an error of law by determining that Petitioner did not meet his burden to prove that he suffers from pure sensory brachial neuritis. ECF No. 71 at 6, 14; *see id.* at 15 (alleging error because "[t]here is far too much evidence satisfying [his] initial burden").  According to Petitioner, the Chief Special Master erroneously elevated Petitioner's burden in regard to the degree and type of proof he required.  *Id.* at 15, 16, 18–19.  The Court finds no error in the Chief Special Master's application of the burden of proof and agrees with Respondent that Petitioner's arguments are mere disagreements with the weight the Chief Special Master afforded the evidence.

Petitioner emphasizes that an off-Table injury claim in the Vaccine Program "only" requires a showing of preponderant evidence satisfying the three prongs of the *Althen* causation analysis.  *Id.* at 15.  He further emphasizes that proving causation to a scientific certainty is not required.  *Id.* at 16.  Once satisfied, Petitioner contends that "the burden shifts to the Government to prove a more likely alternative explanation."  *Id.* at 15.  Under this framework, Petitioner contends that given the amount of evidence supporting his expert's opinion it was an "error of law to state that Petitioner 'failed to meet his burden,'" and the burden should have shifted to Respondent per *Althen*.  ECF No. 74-1 at 2; ECF No. 71 at 15, 24.  As Petitioner correctly observes, the legal framework for vaccine cases is well established in Federal Circuit and Court of Federal Claims decisions that define the causation standard.  ECF No. 71 at 17 (citing, *e.g.*, *Campbell v. Sec'y of Health & Hum. Servs.*, 90 Fed. Cl. 369, 380–81 (2009) ("'[T]he purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and

20

direct proof of how vaccines affect the human body."); *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994) ("[T]o require identification and proof of specific biologic mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program."); *Moberly*, 592 F.3d at 1325 ("[T]he legal standard is preponderance of the evidence, not scientific certainty." (citing *Andreu*, 569 F.3d at 1378))).

Although Petitioner accurately describes the standard of proof for causation-in-fact, Petitioner overlooks clear Federal Circuit precedent in cases, like this one, where the alleged injury is disputed. *See Broekelschen*, 618 F.3d at 1346. Petitioner's claim is analogous to the claim in *Broekelschen* where the petitioner also received the flu vaccine. *Id.* at 1342. Six weeks post-vaccination, the *Broekelschen* petitioner was hospitalized with severe pain in his chest, neck, arms, and left scapula. *Id.* Doctors recorded symptoms characteristic of both anterior spinal artery syndrome, a vascular condition, and transverse myelitis, an inflammatory response. *Id.* The petitioner filed for compensation under the Vaccine Act alleging that the flu vaccine caused him to suffer transverse myelitis. *Id.* at 1343. As is the case here, Respondent's expert witness disagreed with the alleged injury and argued that the petitioner suffered from anterior spinal artery syndrome, not caused by the flu vaccine. *Id.* Due to the competing diagnoses, the special master first determined which diagnosis was best supported by evidence in the record before applying the *Althen* causation test. *Id.* at 1346. On appeal, the Federal Circuit held that "it was appropriate" for the special master to do so because "the special master could subsequently determine causation relative to the injury." *Id.*

The Court applies this same principle articulated in *Broekelschen* and will not deviate from the long-standing and well-established precedents. *See, e.g.*, *Lombardi*, 656 F.3d at 1356; *Hibbard*, 698 F.3d at 1369; *Contreras v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1363, 1368

(Fed. Cir. 2017); *see also O.M.V. v. Sec'y of Health & Hum. Servs.*, 157 Fed. Cl. 376, 385 (2021); *Mager v. Sec'y of Health & Hum. Servs.*, 158 Fed. Cl. 136, 156 (2022).  To do so would collapse the threshold requirement to prove existence of an injury by a preponderance of evidence with the standard of proof for causation-in-fact under *Althen*.  Petitioner cannot avoid clear, binding precedent that requires a finding on the factual question of injury preceding the causation analysis and shifting of the burden to Respondent.

Petitioner also highlights two other ways in which the Chief Special Master allegedly elevated Petitioner's burden with regard to the degree and type of proof he required—*i.e.*, his application of the diagnostic criteria and consideration of the treating physicians' diagnoses. Neither objection is persuasive.

As to the diagnostic criteria for the alleged injury, Petitioner contends that the Chief Special Master required a diagnosis of his injury that "check[s] every single box of a disease with varying presentations."  ECF No. 71 at 19.  Because Petitioner did not demonstrate symptoms of "weakness," Petitioner contends that the Chief Special Master "erroneously disregarded a pure sensory manifestation of brachial neuritis" and "used criteria for a different injury to exclude causation."  *Id.* at 18–19.  The Chief Special Master does this, Petitioner alleges, despite Petitioner's expert's report and testimony explaining that "[t]he sensory form [of brachial neuritis] has no weakness."  *Id.* at 18 (emphasis omitted) (quoting ECF No. 41-1 at 10).

Petitioner's argument presumes that his expert's testimony as to the significance of muscle weakness (or lack thereof) was not in dispute.  He highlights Dr. Andersson's supplemental report, which asserted that "'[t]he absence of weakness does not bear on the diagnosis of brachial plexitis.'"  *Id.* (emphasis omitted).  But Respondent's expert provided a contrary opinion, testifying that "'in the absence of neurographic studies, [diagnosis] requires weakness in [the] muscles

supplied by more than one peripheral nerve.'"  ECF No. 69 at 9 (quoting Tr. at 191, ECF No. 63).

Indeed, both parties' experts laid out the differing factors they considered relevant to the diagnosis

of Petitioner's claimed injury.  *See id.* at 6 (citing Tr. at 137–38) (Dr. Andersson), 9 (citing Tr. at

191) (Dr. Callaghan).  The Chief Special Master considered each side's evidence and applied the

criteria provided by Respondent's expert, which draws from the Table's criteria.  *Id.* at 23–24.

The Chief Special Master acknowledged that the Table's criteria for a brachial neuritis injury were

not controlling in an off-Table claim, but nonetheless provided "useful guidance."  *Id.* at 23.  It

cannot be said, then, that he "disregarded" Petitioner's evidence or claimed injury; he merely

assigned a weight to Petitioner's expert opinion different from that which Petitioner argued.

As to treating physicians' diagnoses, Petitioner contends that the Chief Special Master "set

aside" Petitioner's evidence and gave "great weight" to the contemporaneous diagnoses of

Petitioner's treating physicians (diabetic neuropathy, CTS, and cervical radiculopathy).  ECF No.

71 at 19.  He claims that in doing so the Chief Special Master "effectively overlooked" Dr.

Andersson's rebuttal of "alternate explanations" for Petitioner's symptoms and prevented Dr.

Andersson from disagreeing with or challenging the treating physicians' diagnoses.  *Id.* at 20; *see*

*id.* at 22–23.  The Entitlement Decision does not bear out that argument.  ECF No. 69 at 6

(summarizing Dr. Andersson's diagnosis), 24 (assessing Dr. Andersson's diagnosis).  Rather,

consistent with Federal Circuit precedent, the Chief Special Master considered Petitioner's

contemporaneous medical records and weighed the evidence to determine the injury "best

supported by the record."  *Broekelschen*, 618 F.3d at 1346 (a special master must "determine

'based on the *record evidence as a whole and the totality of the case*, whether it has been shown

by a preponderance of the evidence that a vaccine caused the [petitioner's] injury'" (emphasis

added) (quoting *Andreu*, 569 F.3d at 1382)); *see* ECF No. 69 at 22–24.

Petitioner's reliance on *Cloer v. Secretary of Health and Human Services* for the proposition that requiring contemporaneous treater support of an alleged injury in a vaccine case goes against the intent of the Vaccine Program is misplaced.[8]  ECF No. 71 at 23 (citing *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1332 n.4 (Fed. Cir. 2011)).  In *Cloer*, the Court established at the outset that the petitioner suffered from multiple sclerosis.  654 F.3d at 1327.  The issue in dispute was when the Vaccine Act's statute of limitations was triggered.  *Id.* at 1330.  The petitioner argued that a "'vaccine-related injury' for purposes of the Vaccine Act and its statute of limitations cannot occur until the medical community at large understands and recognizes the causal relationship between the claimed injury and the administration of a vaccine."[9]  *Id.*  The Federal Circuit disagreed and instead allowed for non-objective circumstantial evidence in off-Table petitions to potentially establish the first links between a vaccine and an injury.  *Id.* at 1332 n.4.  Although *Cloer* provides support for Petitioner's contention that a diagnosis by a contemporaneous treater is not required for a successful vaccine injury claim, this is not what the Chief Special Master required here.  Instead, he weighed all the evidence, including the experts' diagnoses and the treating physicians' diagnoses, to determine whether Petitioner had presented preponderant proof of the alleged injury.

Accordingly, the Court finds that the Chief Special Master did not commit an error of law by elevating Petitioner's burden of proof.  He properly determined as an initial matter that

---

[8] In citing *Cloer*, Petitioner separately and interchangeably refers to contemporaneous treater support of the injury's diagnosis and for causation of the injury, again collapsing the factual determination of the injury with the legal standard of causation-in-fact.  *Compare* ECF No. 71 at 22 *with id.* at 23.

[9] In addition, like Petitioner's allegation that the Court is requiring "scientific certainty" of his claimed injury, the petitioner in *Cloer* initially argued that "no vaccine-related injury can occur before a clinically definite diagnosis is made."  *Cloer*, 654 F.3d 1322 at 1330.  However, the petitioner abandoned this argument on appeal.  *Id.*

Petitioner did not sufficiently prove his alleged injury by a preponderance of evidence. Petitioner's objections to the Chief Special Master's reliance on certain pieces of evidence, and not others, to reach that conclusion goes to the weight the Chief Special Master afforded the evidence.

**B.** **The Chief Special Master Appropriately Weighed the Evidence and Rationally Explained His Determination.**

Throughout his Motion, Petitioner disputes the Chief Special Master's approach to weighing the evidence in the record. *See*, *e.g.*, ECF No. 71 at 18 (the Chief Special Master "erroneously disregarded" certain evidence), 19 (assigned "great weight" to some evidence, while other evidence was "set aside"), 21 ("effectively overlooked" relevant evidence and "over-emphasized" other evidence). Giving broad deference to the Chief Special Master's findings of fact, the Court finds no reason to disturb the decision because the Chief Special Master considered the relevant evidence and provided a rational basis for his factual determination regarding Petitioner's alleged injury. *See Lampe*, 219 F.3d at 1360; *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011); *Hines*, 940 F.2d at 1528.

Under the arbitrary and capricious standard, a special master has "broad discretion to weigh evidence and make factual determinations." *Dougherty v. Sec'y of Health & Hum. Servs.*, 141 Fed. Cl. 223, 229 (2018). When reviewing a special master's factual findings, the Court will "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter*, 663 F.3d at 1249; *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) ("[The Court's] role is not to 'second guess the Special Master[']s fact-intensive conclusions' particularly in cases 'in which the medical evidence of causation is in dispute.'" (quoting *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993))). With respect to factual findings, "[r]eversible error is 'extremely

difficult to demonstrate' if the special master 'has considered the relevant evidence of record, drawn plausible inferences[,] and articulated a rational basis for the decision.'" *Loyd, Next Friend of C.L. v. Sec'y of Health & Hum. Servs.*, No. 2022-1371, 2023 WL 1878572, at *2 (Fed. Cir. Feb. 10, 2023) (quoting *Hines*, 940 F.2d at 1528).

Petitioner's Motion raises several objections to the weight the Chief Special Master gave to the evidence in the record.  For example, Petitioner contends that the Chief Special Master "over-emphasiz[ed]" the "incidental findings" of his EMG test results, and by doing so moved the "goal posts" for a successful vaccine injury petition.  ECF No. 71 at 21–22.  In support of this argument, Petitioner cites *Abels v. Secretary of Health and Human Services*, arguing that a petitioner can prevail on a brachial neuritis claim even if his EMG test shows other potential diagnoses or "incidental findings."  *Id.* at 21 (citing *Abels v. Sec'y of Health & Hum. Servs.*, No. 18-558V, 2022 WL 2036101, at *21 (Fed. Cl. May 6, 2022)).  Petitioner's reliance on *Abels* is misplaced.  The dispositive issue in *Abels* was the temporal onset of injury, not the diagnosis of the injury itself.  2022 WL 2036101, at *1.  There, the special master noted that Respondent's expert "agreed that brachial neuritis is 'the correct diagnosis,'" *id.* at *11, even though the petitioner's EMG test results "showed changes consistent with either C5-6 radiculopathy or upper trunk plexopathy," *id.* at *4.  The special master found "strong support" for the petitioner's claim of brachial neuritis because his "clinical course was consistent with the development of brachial neuritis after vaccination."  *Id.* at *18.  Thus, in *Abels*, the appearance of C5-6 radiculopathy results on the petitioner's EMG test was indeed uncorroborated "incidental" evidence that did not weigh in favor of the "correct" diagnosis.  *Id.* at *4–5.

Here, the Chief Special Master found that Petitioner's so-called "incidental" findings of CTS and cervical radiculopathy on his EMG test *was* corroborated by other evidence in the record,

26

supporting the conclusion that Petitioner's injury was *not* a rare pure sensory form of brachial neuritis. ECF No. 69 at 24 ("[T]he EMG/NCS testing did not reveal injury to sensory nerves (as would be expected in a pure sensory form of brachial neuritis), but instead was (again) fully consistent with CTS, cervical radiculopathy, and neuropathy (all of which were the diagnoses made by Petitioner's treating physicians)."); ECF No. 31-1 at 4–5; *see Burns*, 3 F.3d at 417.

Contrary to Petitioner's objections, the Chief Special Master properly weighed witness testimony, expert reports, medical literature, and Petitioner's contemporaneous medical records. The Chief Special Master observed that Petitioner's expert, Dr. Andersson, identified and analyzed diagnostic factors associated with brachial neuritis, ECF No. 69 at 6 (citing ECF No. 26-1 at 7–8), and concluded that Petitioner's injury was more likely a vaccine-induced sensory form of brachial neuritis rather than cervical radiculopathy or CTS, *id.* (citing ECF No. 26-1 at 8–9). The Chief Special Master noted that Dr. Andersson submitted literature in support of his opinion that Petitioner's brachial neuritis was likely due to a secondary/adaptive immune process. *Id.* at 7. Finally, the Chief Special Master noted Dr. Andersson's conclusion that the timeframe of the onset of the injury was consistent with an adaptive/secondary immune-mediated process. *Id.* at 7–8.

The Chief Special Master also reviewed material submitted by Respondent's experts.[10] He observed that Dr. Callaghan also addressed the diagnostic criteria for brachial neuritis and concluded that "Petitioner neither suffered from brachial neuritis nor from a pure sensory form of

---

[10] Respondent's second expert, Dr. MacGinnitie, offered his opinion on causation theories (innate or immune response to the vaccine). His report and testimony are not further addressed in this opinion because they pertain solely to the issue of causation, and the dispositive issue here is the diagnosis of the injury. *See* ECF No. 69 at 11 ("Dr. MacGinnitie began his testimony by noting that he would not be offering an opinion on the diagnosis of brachial neuritis, deferring on that issue to Dr. Callaghan." (citation omitted)); *id.* ("Dr. MacGinnitie provided his view as to whether there likely exists a reasonable mechanism by which the flu vaccine could trigger brachial neuritis[.]" (citation omitted)).

the condition, but instead more likely suffered from diabetic neuropathy, cervical radiculopathy, and/or CTS," as he had been diagnosed by his treating physicians based on his reported symptoms. *Id.* at 9 (citations omitted) (noting that there was no mention of brachial neuritis in treater records). The Chief Special Master noted Dr. Callaghan's explanation that a brachial neuritis diagnosis "requires weakness" in the associated muscles.[11]  *Id.* (citing ECF No. 31-1 at 4–5).  Petitioner's reported degree of pain, the fact that the symptoms did not appear to be widespread, and the fact that Petitioner's EMG results did not show "dysfunction that could be attributed to the brachial plexus" were additional factors reviewed by the Chief Special Master that weighed against a brachial neuritis diagnosis. *Id.* (citing ECF No. 33-1 at 5).  The Chief Special Master also weighed Dr. Callaghan's conclusion that Petitioner's past medical history was a more likely explanation for his symptoms and that Dr. Callaghan could find no reliable literature to support a likely causal link between the flu vaccine and brachial neuritis. *Id.* at 10.

A special master is not required to cite every piece of submitted evidence; however, his decision must be supported by the evidence in the record.  *See Moriarty by Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016); *see also Hines*, 940 F.2d at 1528. In assessing the evidence, a special master may give more weight to contemporaneous medical records than to evidence offered later during litigation.  *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (citing *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)).  Here, acknowledging that Dr. Andersson was well qualified and "made many credible points," the Chief Special Master ultimately found Dr. Callaghan more persuasive.  ECF No. 69 at 24.  As such, the Chief Special Master concluded that (1) the claimed

---

[11] *See supra* § III.A.  The Chief Special Master did not "erroneously disregard[]" the claimed injury due to lack of reported weakness.  ECF No. 71 at 18.  The absence of weakness was one factor considered, as well as the lack of injury to sensory nerves.  ECF No. 69 at 24.

injury was "not corroborated by record evidence of contemporaneous treater support," *id.* at 23; (2) Petitioner did not meet the criteria for a brachial neuritis claim given the absence of muscle weakness and because Petitioner's EMG testing "did not reveal injury to sensory nerves," *id.* at 23–24; and (3) Dr. Callaghan effectively rebutted Petitioner's claimed injury as lacking record evidence substantiation, *id.* at 23 ("[D]isposition of the case depends on the finding that this injury has preponderant evidentiary support. Unfortunately, the record does not support that conclusion.").  His assessment of the persuasiveness of the parties' expert witnesses was a matter within in his discretion.  *See Moberly*, 592 F.3d at 1325–26 ("Assessments as to the reliability of expert testimony often turn on credibility determinations, particularly in cases such as this one where there is little supporting evidence for the expert's opinion.").

Accordingly, the Court finds that the Chief Special Master properly considered the evidence as a whole, supported his conclusions with citations to the record, and articulated a rational connection between the facts found and the determination made.  *See Hines*, 940 F.2d at 1528.  The Court will not "'second-guess'" the decision's "'fact-intensive conclusions.'"  *Cedillo*, 617 F.3d at 1338 (quoting *Hodges*, 9 F.3d at 961).

## IV.  CONCLUSION

The Court finds that the Chief Special Master's examination of the record in Petitioner's case, including the hearing testimony, expert reports, Petitioner's contemporaneous medical records, and the literature submitted, resulted in a decision that was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  42 U.S.C. § 300aa-12(e)(2)(B).  The Chief Special Master's Entitlement Decision is therefore affirmed, and Petitioner's Motion for Review (ECF No. 70) is **DENIED**.  In addition, Petitioner's Motion for Leave to File Petitioner's Reply in Support of Motion for Review (ECF No. 74) is **GRANTED**.

The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**SO ORDERED**.


Dated: May 23, 2024                                              */s/ Kathryn C. Davis*
                                                                KATHRYN C. DAVIS
                                                                Judge